**BRUNO'S, INC., a corporation, Birmingham, Jefferson County, Alabama, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 79–1194.

United States Court of Appeals, Fifth Circuit.

Aug. 20, 1980.

As Modified Oct. 3, 1980.

J. R. Brooks, U. S. Atty., Elizabeth Todd Campbell, Asst. U. S. Atty., Birmingham, Ala., for defendant-appellant.

Sirote, Permutt, Friend, Freidman, Held & Apolinsky, Jack E. Held, F. Timothy McAbee, Birmingham, Ala., for plaintiff-appellee.

Before COLEMAN, Chief Judge, RONEY and GARZA, Circuit Judges.

COLEMAN, Chief Judge.

This action arises under 7 U.S.C. § 2020 *et seq.* Bruno's grocery store challenges the Department of Agriculture's 60-day suspension of its right to redeem food stamps. The District Court found that Bruno's had violated the Food Stamps Act but ruled that the 60-day suspension was arbitrary and capricious. It directed that the 60-day sanction be reduced to a written warning. The Department of Agriculture appeals and we affirm.

Bruno's Store No. 11 is a large grocery store located in a low income section adjacent to the Jefferson County food stamps office in Birmingham. Testimony at trial indicated that food stamps constitute 95% of its business. From 1963 to 1977 it had not been found guilty of violating the Food Stamps Act by trading food stamps for non-food items. Bruno's trains its clerks in the subtleties of the Act and its regulations. It is Bruno's policy to discharge employees who intentionally violate the Act.

Because Bruno's annually redeems a larger than average volume of food stamps it has drawn the attention of the Department of Agriculture, Food and Nutrition Service ("FNS" hereafter). On August 27, 1969, FNS sent Bruno's a letter pointing out its high food stamp volume. FNS said this led it to suspect that Bruno's was involved in violations of the regulations. Bruno's response attributed its large volume to its location and its reputation in the neighborhood for low prices. On November 19, 1975, FNS conducted a formal investigation of Bruno's but found no violation of regulations. Nevertheless, FNS continued to worry about Bruno's high food stamps volume. On February 25, 1976, FNS sent Bruno's another letter, pointing out the high volume and again indicating that it suspected Bruno's of violating the Act.

In addition to these letters and the investigation FNS estimates it made 25 "educational" visits to Bruno's between 1963 and 1977. FNS says these visits were not to look for violations, but to explain regulations to Bruno's and to make sure that Bruno's personnel understood the regulations. Bruno's says these visits lasted no more than 5–10 minutes, took place in the public area of the store during business hours, and consisted of FNS employees asking cashiers and the store manager elemental questions about food stamps regulations to see how knowledgeable they were.

Between March 15 and March 24, 1977, FNS returned to the matter and conducted another investigation of Bruno's. Undercover shoppers for FNS made six attempts to purchase ineligible items. They were successful on five of the six attempts. Ineligible items purchased included paper products, personal hygiene items, and detergents. Of the five successful undercover shoppers, three were able to purchase all the ineligible items they sought, and two had some, but not all, ineligible items refused. Of the 62 items purchased by the six shoppers 14 were ineligible, 23% of the total (by item).

FNS sent Bruno's a notice June 10, 1977, that it had reason to believe Bruno's had violated the regulations governing the food stamps program, 7 C.F.R. 270–274. Bruno's denied that ineligible purchases had oc-

curred. FNS did not credit Bruno's denial, and on August 18, 1977, sent it a notice that FNS had disqualified Bruno's from redeeming food stamps for a period of 60 days. Bruno's appealed the suspension, asking for administrative review. On review the decision was not altered. On March 8, 1978, K. Wayne Freeman, Food Stamp Review Officer for FNS, affirmed the earlier suspension. Bruno's then sought a de novo trial before a state court. The FNS removed the case to federal district court. There, the Court found the violations of FNS regulations had taken place but determined that the 60-day suspension was arbitrary and capricious. The Court specifically found that FNS had violated its own regulations in levying the suspension and that the reviewing officer had gone outside the record in determining factors in justification of the suspension. The penalty given to Bruno's was reduced from a 60-day suspension to a letter of warning. The FNS appealed, arguing that the court below erred as a matter of fact and law in substituting a warning for the penalty assessed by FNS in the exercise of its administrative discretion.

A review of an administrative decision such as this suspension of food stamp redemption privileges involves two questions: (1) Did the violation occur? and (2) Is the penalty "valid"? The statute regulating the Food Stamps Program allows a de novo review by a federal court of the determination that a violation occurred.[1] There is a split in the Circuits on whether federal courts can take review one step further and determine whether the penalty is valid.[2]

In *Cross v. United States*, 512 F.2d 1212 (1975) the Fourth Circuit, based upon a constitutional analysis, determined that the federal courts were required to review the penalty as well as the violation. The Fifth

Circuit supported the same view in *Goodman v. United States*, 518 F.2d 505 (5th Cir. 1975) but its decision was grounded on an analysis of the plain meaning of the Food Stamps Act.

Although Bruno's initially denied violating the Act, at trial it conceded the violations. Only the validity of the penalty is now attacked.

■ The standard for reviewing a penalty assessed by an administrative agency was set out in *Goodman v. United States, supra* (quoting *Cross*):

To be "valid" a sanction must not be arbitrary and capricious, and a sanction is arbitrary and capricious if it is unwarranted in law or without justification in fact. 518 F.2d at 511.

The determination appropriately to be imposed for a violation of the Food Stamps Act is an exercise in administrative discretion. *Goodman v. United States, supra.* The ultimate question is whether the District Court erred in determining that the sanction assessed by the FNS against Bruno's was "unwarranted in law" and "without justification in fact."[3]

The determination of the sanction to be applied to one who violates the Food Stamps Act is set out in FNS guidelines 744–9. These guidelines provide some uniformity in assessment of penalties, but are flexible enough to fit the unique facts of each case.

Guidelines 744–9 do not contemplate that a violator store shall be suspended from redeeming food stamps the first time it is caught in violation unless there are special circumstances relating to the violation. Section IV F of the Guidelines states that "A warning letter will *normally* be the first

---

**1.** 7 U.S.C. § 2022(c) provides, in part, that "[i]f the store or concern feels aggrieved by such final [administrative] determination he may obtain judicial review thereof." The review " . . . shall be a trial *de novo* by the court in which the court shall determine the validity of the questioned administrative action in issue."

**2.** The Sixth and Seventh Circuits have determined that the penalty is not reviewable by the courts. *Martin v. United States*, 459 F.2d 300 (6th Cir. 1972); *Save More of Gary, Inc. v. United States*, 442 F.2d 36 (7th Cir. 1971).

**3.** The District Court here determined both were true. In order to find the penalty invalid as arbitrary and capricious only one of the two needs to be proven.

determination in the following situations: (3) The evidence clearly shows that violations occurred contrary to the retailer's policy." [Emphasis added.] In determining whether the violation warrants a more serious penalty than a letter of warning, the Guidelines look at many factors, including the ratio of ineligible items to total purchases,[4] the types of ineligible items,[5] the percentage of clerks involved,[6] whether the illegal sales were inadvertent or deliberate,[7] and whether the violations are a matter of store policy.[8]

In this case the record definitely establishes that the violations were against store policy. The District Court determined that Bruno's had done all it could to prevent violations. In transactions occurring over a period of eight days, only three clerks were implicated. The record does not indicate how many checkout clerks Bruno's employs, but it does show that they have six checkout counters. In a store which operates on two (and perhaps three) shifts, three clerks are not shown to have been a substantial percentage of all the clerks. Of the items purchased by the undercover shoppers 23% were ineligible. All ineligible items fall into the middle category FNS has estab-

lished to rank the seriousness of ineligible purchases, "Common grocery type ineligible items." FNS classified these as clearly ineligible (as opposed to items which could be inadvertently slipped by), but not as serious as "Major Non-Grocery Type Ineligible Items," such as cigarettes or alcoholic beverages. FNS undercover shoppers attempted to purchase cigarettes with food stamps, but Bruno's clerks rejected the attempt.

To assist FNS factfinders in determining which penalty to assess, Guidelines 744–9 give a number of examples of violation, contrasting examples as "more serious" and "less serious". According to these examples, Bruno's violations fall predominantly into the "less serious" categories.[9] It may be said that Bruno's violations are not insignificant, inadvertent, or technical, but in their comparative ranking of violations, the Guidelines certainly do not view them as very serious.

FNS asserts two Guidelines justifications for the suspension. Section IV E (1) allows a 30–60 day suspension where "[t]he evidence shows that violations occurred due to poor supervision and general carelessness, even though FNS personnel made a significant compliance effort before the investiga-

---

4. FNS Guidelines 744–9, Section III(A)(4)(b).

5. Section III(A)(4)(a) divides ineligible items into three categories:

   (1) *Marginal Ineligible Items* are items which can easily be mistaken for eligible items and sold for coupons through oversight.
   EXAMPLES: canned pet food or imported food products.
   (2) *Common Grocery Type Ineligible Items* are easily identifiable ineligible items of low cost.
   EXAMPLES: cleaning products such as soap, or paper products such as toilet tissue.
   (3) *Major Non-Grocery Type Ineligible Items* are alcoholic beverages and easily identifiable items of high cost.
   EXAMPLES: clothing, home furnishings, hardware, cartons of cigarettes, or alcoholic beverages.

6. Section III(A)(5).

7. Sections III (introduction), III(A)(4)(b) and III(B) (generally).

8. Section III(B)(4).

9. Some relevant comparisons:

   Section III(A)(4)(a) "The sale of an electric mixer would be considered more serious than the sale of a box of detergent."
   Section III(A)(4)(b) "A transaction in which only two of twenty items sold were ineligible would not be considered as serious as one in which over half of the items sold were ineligible." The example states further that a sale where only 2 of 20 items were ineligible might not be considered at all in determining a penalty if the ineligible items were not of a serious nature and "could easily be overlooked at the check stand."
   Section III(A)(5) ". . . if only one of 5 clerks was found violating, the violations would be considered less extensive and the case less serious than if all five clerks were found violating."
   Section III(B)(1) "A case in which the clerks sold ineligible items and the owner refused to do so would be considered less serious than a case in which the opposite occurred."

tion to prevent violations." Section IV E (3) allows a similar penalty where "[t]he evidence is limited to only three successful clearly violative buys of ineligible items, and FNS personnel took significant compliance action before the investigation to prevent violations."

The evidence at trial does not indicate that the violations here occurred because of "poor supervision and general carelessness." The court below specifically found that Bruno's had done all it could to prevent violations and the record does not justify appellate rejection of this finding.

Bruno's argues that the FNS compliance activities in this case were not "significant" as required by the guidelines. In its decision the District Court spoke on this question, stating "While some issue has been made of whether there had been *significant* compliance efforts on the part of the Department of Agriculture agents, the court finds the compliance efforts to have been *adequate.*" [Emphasis added.] It is unclear whether by "adequate" the court meant "sufficient to meet the requirements of the guidelines" or whether it meant "adequate" as a lesser standard than "significant." Interpreting this ambiguous statement in the manner most consistent with the Court's determination in this case, it does not appear that an average of two perfunctory 5–10 minute visits each year for thirteen years and two letters informing Bruno's that it sold more food stamps than the average constitutes "significant" compliance activity.[10] Most significantly, if there was not significant compliance activity here on the part of FNS agents, the sanction must fail as "unwarranted in law."

■ If we were to assume that compliance activity was significant, here the sanction must fail as arbitrary and capricious because of administrative reliance on matters outside the record. The record demonstrates the probable reason that FNS gave Bruno's a 60-day suspension on its first offense was because of its abnormally high ratio of food stamp redemption, a matter which the FNS had chosen to worry about for more than a decade, but with no evidence of actual violations. Although FNS may legitimately use this as a basis for further investigations, it may not use it as a factor in determining the penalty. Mr. K. Wayne Freeman, who reviewed the penalty, stated that he considered the two warning letters as proof of significant compliance activity, but not for their content. Mr. Freeman testified that Bruno's high ratio of food stamp redemption was *no* factor in the determination of the penalty. The District Court, making a credibility choice, determined Freeman's statements on this key point were fundamentally inconsistant and concluded that FNS had considered Bruno's high redemption rate as proof of past violations (violations unproven in the record) and based the suspension in part upon this ratio. FNS has not established that this finding is clearly erroneous, and on review we are bound by it.[11] Moreover, FNS cannot base the penal-

Section III(B)(2) "In most cases, the benefit of the doubt should be to the retailer, and the partial refusal should be considered a true effort to obey the law."

10. Section III(C) subdivides administrative actions into two categories: "(1) educational actions, and (2) compliance activity." It states that "Educational action is present to some degree in all cases. Compliance action is not present in all cases." At trial Bruno's sought to argue that had it been engaged in violations, FNS would have discovered it during one of its 25 visits between 1963 and 1977. FNS' response to this was that the visits were all educational, and that its agents did not use them to look for violations. Section III(C)(2) further defines compliance action as " . . . any action taken to confront the retailer with the possibility that violations are being committed in his store and cautioning him against further violations." According to this definition only the suspicion letters of 1969 and 1976, and perhaps the fruitless 1975 investigation, qualify as "compliance activity."

11. Rule 52(a) of the Federal Rules of Civil Procedure provides that "findings of fact should not be set aside unless clearly erroneous." We are particularly reluctant to overturn a finding based upon the District Court's observation of the demeanor of the witness since the District Judge had the opportunity to analyze it and we do not.

ty upon matters not in the record. To do so is an arbitrary and capricious act, one which makes the penalty "without justification in fact", and we decline to countenance it.

The FNS argument asks for absolute, unfettered discretion in the administrative factfinder in setting a penalty, if such penalty is within its broad administrative guidelines. Even if such penalty is within the FNS guidelines, it is reviewable if FNS acted arbitrarily and capriciously in choosing which guidelines to emphasize and in assessing the penalty. *Goodman v. United States*, 518 F.2d 505, 511 (5th Cir. 1975); *Cross v. United States*, 512 F.2d 1212, 1218 (4th Cir. 1975).

The Judgment of the District Court is AFFIRMED.